**KALORAMA HEIGHTS LIMITED PARTNERSHIP, Petitioner,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS, Respondent,**

and

**Sheridan–Kalorama Historical Association, Intervenor.**

No. 92–AA–727.

District of Columbia Court of Appeals.

Argued Feb. 10, 1994.

Decided March 16, 1995.

itself, *id.* § 5–1002(11), as unconstitutionally vague. Finding no error and no constitutional infirmity, we affirm.

## I.

*Facts and Proceedings*

Petitioner, Kalorama Heights Limited Partnership (KHLP), purchased "Moses House," located in the Sheridan–Kalorama Area at 2129 Wyoming Avenue, N.W., for $1,045,000 in January 1989.[1] KHLP planned to demolish Moses House and to develop the site as a twelve-family luxury condominium apartment building with underground parking. On June 13, 1989, KHLP filed an application for a demolition permit with the Department of Consumer and Regulatory Affairs.

Meanwhile, on February 13, 1989, the Sheridan–Kalorama Historical Association (the Association) had filed an application with the Historic Preservation Review Board (the Review Board) for designation of the Sheridan–Kalorama area as an Historic District. On August 16, 1989, the area was so designated and listed on the District of Columbia Inventory of Historic Sites. Subsequently, when the National Register of Historic Places recognized the Sheridan–Kalorama Historic District, Moses House was noted as a contributing structure in that Historic District.

Before purchasing Moses House, KHLP had been aware that its proposed condominium project would require substantial zoning variances.[2] Its lawyers had advised, moreover, that there was only a fifty percent chance these variances would be granted. KHLP's lawyers also had informed KHLP

Benny L. Kass, with whom Michael H. Haberman, Washington, DC, was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel at the time, Charles L. Reischel, Deputy Corp. Counsel, were on the memorandum in lieu of brief, Washington, DC, for respondent.

Samuel M. Forstein, with whom Alfred H. Moses, Washington, DC, was on the brief, for intervenor.

Before FERREN * and TERRY, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

Petitioner seeks review of an order of the Mayor's Agent under the Historic Landmark and Historic District Protection Act of 1978, D.C.Code §§ 5–1001 *et seq.* (1994 Repl.) (the Act), denying its application for a demolition permit for "Moses House," the former French Embassy in Northwest Washington. Petitioner challenges (1) the Mayor's Agent's finding that petitioner's proposed project was not one of "special merit," *id.* §§ 5–1002(10), –1002(11), –1004(e); (2) his finding that denial of the permit did not cause petitioner to suffer "unreasonable economic hardship," *id.* §§ 5–1002(14), –1004(e); and (3) the "special merit" provision of the Act

---

\* Former *Associate Judge* SULLIVAN was a member of the division that heard oral argument in this case. After his departure from the court, *Associate Judge* FERREN was selected by lot to replace him.

1. Moses House, consisting of a main house with a smaller carriage house in the rear, was constructed in 1892 in the Queen Anne style and was redesigned in 1925 to its current neo-classical appearance. Moses House served as the French Embassy and Consulate from the 1940s until 1984. It has been vacant since 1984 and has physically deteriorated.

2. KHLP's proposed development consisted of a six story, twelve unit multi-family luxury condominium building with a height of 60 feet, an underground parking garage for 26 or 27 cars, a lot occupancy of 48 percent, and a rear lot line setback of 20 feet. This development would require substantial zoning variances from regulations in the Sheridan–Kalorama area that permit development of a single family detached dwelling with a maximum height of three stories/40 feet, a maximum lot occupancy of 40 percent, and a rear lot line setback of 25 feet.

that "preservationist impulses in the [Sheridan–Kalorama] area [were] quite strong."[3]

On April 25, 1990, several months after designation of the Sheridan–Kalorama area as an Historic District, KHLP's application for a demolition permit was referred to the Review Board. The Board's staff recommended denial.[4] On July 18, 1990, the Review Board held a meeting to address KHLP's application at which the Board heard oral presentations and received written submissions. The Review Board subsequently adopted the staff's recommendation against demolition.

KHLP then requested a public hearing before the Mayor's Agent. Hearings were held on October 18 and November 1, 1990, and on March 6, 1991, the Association participated as a party in opposition. During these hearings, fifteen witnesses appeared and 31 exhibits were admitted in evidence. In addition, at the direction of the Mayor's Agent, an expert structural engineer inspected Moses House on November 29, 1990 and filed a report finding it structurally sound though in need of substantial repair. For its own part at the hearings, KHLP presented two arguments: that its proposed condominium project qualified as one of "special merit," D.C.Code § 5–1002(11), and that KHLP would suffer "unreasonable economic hardship," id. § 5–1002(14), if a demolition permit were not granted.[5]

On May 19, 1992, the Mayor's Agent issued a decision and order denying the requested permit. In his findings of fact and conclusions of law, he noted that KHLP had not explored "alternatives other than the existing residence or [KHLP's] proposed 12 unit building." He concluded that, as a consequence, KHLP had not met its burden of proving entitlement to a demolition permit as grounds of "special merit" or "unreasonable economic hardship." KHLP appeals this decision.

## II.

*Standard of Review and Statutory Framework*

We must uphold the Mayor's Agent's decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings. D.C.Code § 1–1510(a)(3)(E) (1992 Repl.); *District of Columbia Preservation League v. Department of Consumer & Regulatory Affairs,* 646 A.2d 984, 989 (D.C.1994); *MB Assocs. v. D.C. Dep't of Licenses, Investigation & Inspection,* 456 A.2d 344, 345 (D.C.1982); *900 G Street Assocs. v. Department of Housing & Community Dev.,* 430 A.2d 1387, 1391 (D.C. 1981). Moreover, when an agency's—and, correlatively, the Mayor's Agent's—decision is based on an "interpretation of the statute and regulations it administers, that interpretation will be sustained unless shown to be unreasonable or in contravention of the language or legislative history of the statute." *Nova Univ. v. Educational Inst. Licensure Comm'n,* 483 A.2d 1172, 1190 (D.C.1984) (citation omitted), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985). In making the necessary findings, a Mayor's Agent is "not required to explain why [he or she] favored one witness' testimony over another, or one statistic over another." *Don't*

---

**3.** Since 1985, residents of the Sheridan–Kalorama district had been exploring the possibility of Historic District status for the neighborhood. In 1987, the Sheridan–Kalorama Historical Association, created as a result of many community meetings, received a grant from the District of Columbia government to undertake a comprehensive survey of Sheridan–Kalorama structures as a preliminary step towards applying for designation of the area as an Historic District. In 1988 and 1989, several public civic group and neighborhood meetings were held to discuss Historic District designation for Sheridan–Kalorama.

**4.** The Staff noted that KHLP's proposal would introduce "an inappropriate scale and mass" to the property that would "adversely dominate its site and surroundings." The Staff accordingly concluded that KHLP's plan was inconsistent with the Act and "would irreversibly damage the integrity of the Historic District."

**5.** KHLP also argued before the Mayor's Agent that one of the reasons the project had "special merit" was its "exemplary architecture." D.C.Code § 5–1002(11). We do not address the Mayor's Agent's finding that the project did not constitute exemplary architecture, however, because KHLP does not challenge this finding on appeal.

*Tear It Down, Inc. v. D.C. Dep't of Housing & Community Dev.,* 428 A.2d 369, 378 (D.C. 1981) (citation omitted).

According to the Act, the Mayor's Agent may not issue a demolition permit unless he or she finds that [A] "issuance of the permit is necessary in the public interest, or that [B] failure to issue a permit will result in unreasonable economic hardship to the owner." D.C.Code § 5–1004(e). "Necessary in the public interest" is defined as "consistent with the purposes of this subchapter as set forth in § 5–1001(b)" (primarily referring to enhancement of historic landmarks and other structures in historic districts) or—of relevance to this case—"necessary to allow the construction of a project of special merit." D.C.Code § 5–1002(10). "Special merit" is defined, in turn, as "a plan or building having significant benefits to the District of Columbia or to the community by virtue of [1] exemplary architecture, [2] specific features of land planning, or [3] social or other benefits having a high priority for community services." D.C.Code § 5–1002(11). Finally, "unreasonable economic hardship" is equated with "a taking of the owner's property without just compensation." D.C.Code § 5–1002(14).

■ The applicant has the burden of proving entitlement to a demolition permit. *See MB Assocs.,* 456 A.2d at 345; *900 G Street Assocs.,* 430 A.2d at 1391. In meeting this burden, the applicant must show that it considered alternatives to the total demolition of the historic building and that these alternatives were not reasonable. *See Citizens Comm. to Save Historic Rhodes Tavern v. District of Columbia Dep't of Housing & Community Dev.,* 432 A.2d 710, 718 (D.C.) ("A developer should be required to show that all reasonable alternatives were considered"), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); *Don't Tear It Down, Inc.,* 428 A.2d at 379–80 ("an applicant may not reject plans which it reasonably should have considered, neglect to bring such plans to readiness, and at [the] hearing use the delay in completing such plans as a basis for rejecting the same; nor can 'necessary' be equated with 'least expensive' and all viable alternatives which are more costly than the one proposed by the applicant, be summarily rejected").

## III.

*Special Merit*

■ KHLP contends that its project "is necessary in the public interest," D.C.Code 5–1004(e), as "a project of special merit," *id.* § 5–1002(11). KHLP then stresses that the Mayor's Agent erred in his "special merit" analysis because he failed to weigh the historical significance of Moses House against the benefits that KHLP's project would confer upon the District. *See Citizens Comm. to Save Historic Rhodes Tavern,* 432 A.2d at 716 ("the Act implicitly requires that, in the case of demolition, the Mayor's Agent [must] balance the historical value of the particular landmark against the special merit of the proposed project").

■ It is important to make clear at the outset that the Mayor's Agent is not required to carry out such a balancing analysis unless the Agent finds that the project has "special merit." *Committee of 100 on the Federal City v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 571 A.2d 195, 203 (D.C.1990) ("the balancing of the historic value of the Woodward Building against the special merits of the project could not proceed until the Mayor's Agent found that the amenities proposed by [applicant] were sufficient to constitute a project of special merit"). In KHLP's case, the Mayor's Agent concluded that the proposed luxury condominium project did not have "special merit." [6]

---

6. In the hearings before the Mayor's Agent, KHLP contended that its proposed project would constitute a plan of "special merit" because it would confer "social or other benefits having a high priority for community services." D.C.Code § 5–1002(11). As proof of "special merit," KHLP said the condominium project would (1) generate increased tax revenues, (2) increase the stock of luxury condominiums with-

in the District, and (3) prevent the building from being used as a diplomatic chancery.

After considering all the special merit factors offered by KHLP, the Mayor's Agent concluded that KHLP had failed to satisfy its burden of proof. Specifically, the Mayor's Agent found that KHLP's projection of increased taxes was based on expected sale prices of the condomini-

Accordingly, unless this conclusion does not flow rationally from substantial evidence of record, we cannot say that the Mayor's Agent erred in failing to undertake the balancing analysis KHLP would require.[7]

■ It is clear that a "special merit" project of the kind at issue here, defined by reference to the third § 5–1002(11) criterion—"social or other benefits"—must provide benefits that have a "high priority" in community services. *Id.* Accordingly, we have noted that "[f]actors which are common to all projects are not considered as special merits." *Id.* at 200 (quoting REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA COMMITTEE ON HOUSING AND URBAN DEVELOPMENT ON BILL 2–367, "THE HISTORIC LANDMARK AND HISTORIC DISTRICT PROTECTION ACT OF 1978," at 6 (October 5, 1978)). Furthermore, to justify demolishing an historic building based on a project's "special merit," the applicant must show that it has considered alternatives to complete demolition. *See Don't Tear It Down, Inc.*, 428 A.2d at 379–80. In this case, KHLP has neither shown that its project has social or other benefits that differ from those

of other condominium projects nor demonstrated that KHLP considered reasonable alternatives to complete demolition. We therefore cannot say that the Mayor's Agent's decision finding no "special merit" is erroneous. Consequently, contrary to KHLP's contention, the Mayor's Agent was not required to weigh the historic value of Moses House against the proposed benefits of KHLP's condominium project.

## IV.

*Unreasonable Economic Hardship*

KHLP also challenges the Mayor's Agent's determination that KHLP would not suffer "unreasonable economic hardship" upon denial of the demolition permit. It contends that (1) the Mayor's Agent misapplied the law; (2) his decision was not based on substantial evidence of record; and (3) he failed to inquire into the cost of revitalizing the building.

Because "unreasonable economic hardship" is defined to mean a "taking of the owner's property without just compensation,"

ums and that these prices were uncertain. He therefore found that KHLP had not shown with certainty that there would be an increase in tax revenues. The Mayor's Agent also noted that the prospect of increased revenues was "not in and of itself a 'special merit' within the meaning of D.C.Code § 5–1002(11)."

With respect to the project's increasing the stock of luxury housing, the Mayor's Agent found that KHLP had failed to show there were no other alternatives—such as maintaining the facade of Moses House and converting the interior into a multi-family dwelling—to meet this need. In addition, the Mayor's Agent found that KHLP's argument that the condominium project would increase the housing stock did not show "special merit" because, under KHLP's reasoning, "any residential highrise with more units than the historical building it replaced would be meritorious."

Finally, the Mayor's Agent found that KHLP had failed to show that the only two alternatives available for redeveloping the Moses House property were a multi-story condominium building and a chancery. The Mayor's Agent noted that, although the zoning laws of the area prohibited construction of the condominium project, the District of Columbia Comprehensive Plan Amendments of 1989, D.C.Law 8–129, cited by KHLP to support its project as having "special merit," only discouraged chanceries in residential areas; they were not prohibited. The May-

or's Agent further noted that the community had made clear it would prefer a chancery to a condominium project.

7. The Association contends that the Mayor's Agent did, in fact, weigh the historical significance of Moses House against the benefits of KHLP's project. The Association points out that before analyzing KHLP's proposed project and determining that it lacked special merit, see *supra* note 6, the Mayor's Agent had concluded from the record that "the evidence presented confirms that the history of the Building (its cultural value), including its alteration made in the 1920s, makes it an artifact of the historical period for which the Sheridan–Kalorama area was designated an Historical District" and that it "has been, and continues to be, deemed a contributing structure to the Historic District." The Association contends that, in making these two determinations, the Mayor's Agent necessarily weighed the virtues of the building against KHLP's project. *See Don't Tear It Down Inc.*, 428 A.2d at 379 ("where we can sift the findings from the restatement of evidence and still have findings on the material contested issue(s), we will not set the findings aside"); *cf. Citizens Comm. to Save Historic Rhodes Tavern*, 432 A.2d at 716–17 (court gleaned from record that Mayor's Agent had implicitly balanced special merits of project against historical significance of building).

D.C.Code § 5–1002(14), a determination of unreasonable economic hardship presupposes a finding that denial of a demolition permit would amount to a deprivation of property without due process.

■ We have defined the standard for "unreasonable economic hardship" in *900 G Street Assocs.* as· follows:

> [I]f there is a *reasonable* alternative economic use for the property after the imposition of the restriction on that property, there is no taking, and hence no unreasonable economic hardship to the owners, no matter how diminished the property may be in cash value and no matter if "higher" or "more beneficial" uses of the property have been proscribed.

430 A.2d at 1390 (emphasis in original). The permit applicant, therefore, has the burden of proving that no reasonable alternative economic use for the property exists. *See MB Assocs.*, 456 A.2d at 345; *900 G Street Assocs.*, 430 A.2d at 1391. It follows that, to prove unreasonable economic hardship, the applicant must show that it would be deprived of "all viable economic uses of the property" without a demolition permit. *Weinberg v. Barry*, 604 F.Supp. 390, 398 (D.D.C.1985).

■ The Mayor's Agent applied the *900 G Street Assocs.* "no reasonable alternative economic use" rule to KHLP's proposal for Moses House and concluded that KHLP had not met its burden.[8] The Mayor's Agent specifically found that, although KHLP had demonstrated that "it would be unprofitable to renovate the property as a single family home," KHLP had not shown that other alternative uses of the property could not reasonably be found. The Mayor's Agent noted, for example, that KHLP had received unsolicited offers for Moses House from several chanceries. The Mayor's Agent also pointed out that, although KHLP had not tried to market Moses House, the latest assessed value of the property "was over a quarter of a million dollars more than the price at which it was purchased two years ago." The Mayor's Agent accordingly found that KHLP had not shown the value of Moses House had declined since KHLP purchased it.

KHLP maintains that the Mayor's Agent erred in applying the "no reasonable alternative economic use" rule to its project because, unlike the applicant in *900 G Street Assocs.*, KHLP had bought Moses House before it was designated an historic landmark. KHLP points out that, in *900 G Street Assocs.*, this court acknowledged that the predictable difficulty of obtaining a demolition permit for a property already subject to historic landmark status must have played into the applicant's calculation of the price it paid for the building, and we specifically noted that we were not considering a case "in which it [was] relevant to determine the reasonable expectations of profit which the owner or purchaser of a property entertained when purchasing the property before the government imposed restrictions." *Id.* at 1390. Focusing on this latter quoted observation, KHLP accordingly argues that the Mayor's Agent, in determining whether KHLP would suffer an unreasonable economic hardship, should have found the *900 G Street Assocs.* rule inapplicable and, instead, conducted a fact-specific inquiry focusing on the impact of the Historic District designation on KHLP's "distinct investment-backed expectations" in purchasing the property before that designation occurred. *Penn Central Trans. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *see also Lucas v. South Carolina Coastal Comm'n*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

KHLP, however, ignores the fact that the *900 G Street Assocs.* rule has been applied in cases, such as *MB Assocs.*, 456 A.2d at 345, and *Weinberg*, 604 F.Supp. at 398, where—as in this case—historical designation took place after the owner purchased the property. More significantly, and contrary to KHLP's assertions, the Mayor's Agent did address the argument that KHLP's "reasonable ex-

---

8. Before making his decision, the Mayor's Agent gave the parties 30 days to study the feasibility of other plans for Moses House that would avoid complete demolition. Although the Association offered to meet with KHLP to discuss alternatives, KHLP told the Association that "a meeting would not be required." The record establishes that although the lawyers for the parties met to work out reasonable alternatives, the parties themselves did not do so.

pectations of profit" in purchasing Moses House should be considered in determining whether denial of a demolition permit would constitute a "taking." The Mayor's Agent noted that KHLP could not reasonably have expected to construct and profit from the proposed condominium project because, before purchasing Moses House, KHLP knew that (1) there were strong preservationist trends in the area and that (2) according to KHLP's own counsel, there was only a fifty percent chance of obtaining required zoning variances to build the condominium project. The Mayor's Agent called KHLP's Moses House acquisition a "speculative investment" tantamount to a "gamble." The Mayor's Agent therefore concluded, based on evidence KHLP either supplied or has not refuted, that even considering KHLP's "investment-backed expectations" KHLP had failed to justify an exception to the *900 G Street Assocs.* rule.

KHLP also contends that the Mayor's Agent either failed to inquire into whether it was commercially feasible to renovate Moses House, or arbitrarily discounted the evidence demonstrating that renovation was not economically possible.[9] *See District of Columbia Preservation League,* 646 A.2d at 990 ("When the applicant relies on the 'unreasonable economic hardship' exception ... an inquiry into the cost of revitalizing a building is not only relevant but required").

At the hearings before the Mayor's Agent, there was conflicting testimony about the cost of renovating Moses House; estimates ranged from $800,000 to $3,000,000. In his findings of fact, the Mayor's Agent credited the estimate of KHLP's expert, who had opined that, "to repair the building—doing a 'middle range repair'—would cost approximately 1.5 million dollars." Contrary to KHLP's assertion, therefore, the Mayor's Agent did not arbitrarily discount evidence

that renovation would not be economically feasible; the record shows that he accepted KHLP's argument that it "would be unprofitable to renovate the property as a single family structure."

The Mayor's Agent also noted, however, that KHLP had not shown it could not "sell Moses House in its current condition at a fair price" or that there was no other economically feasible use for the property than the proposed condominium project. According to the record, in fact, various chanceries had made unsolicited offers for Moses House, and a KHLP partner had testified about his personal belief that KHLP could recover its purchase price by spending "a little bit of money." The Mayor's Agent, therefore, considered whether renovation was reasonably feasible and concluded that even if it was not, KHLP had ways of avoiding loss short of obtaining a demolition permit.

In short, the record shows that KHLP failed to meet its burden of demonstrating unreasonable economic hardship, because it did not show that the value of Moses House had declined since the time of KHLP's purchase or that no other economically viable use existed. The Mayor's Agent's finding that KHLP did not show "unreasonable economic hardship," therefore, is supported by substantial evidence in the record.[10]

## V.

*Unconstitutional Vagueness*

■■ Finally, KHLP challenges the statutory definition of "special merit," D.C.Code § 5–1002(11), claiming that the term is unconstitutionally vague and contending that its application unfairly deprived KHLP of an opportunity to know what factors the Mayor's Agent considered important in making

---

9. KHLP maintains that the Mayor's Agent confined his inquiry relating to the renovation of the building to whether it was physically possible to renovate the existing structure and not whether it was economically feasible to do so.

10. The Supreme Court's recent decision in *Lucas,* ⸺ U.S. at ⸺, 112 S.Ct. at 2896, on which KHLP heavily relies, is distinguishable. In *Lucas,* the court relied upon the agency's finding

that the challenged state regulation—prohibiting any construction on beach-front property—rendered Lucas' property valueless. In this case, no such finding has been made. To the contrary, the Mayor's Agent found that KHLP received a few unsolicited offers for Moses House and that the assessed value of the property had increased since the time KHLP purchased it.

his determination.[11] Specifically, KHLP contends that the words comprising the third "special merit" criterion at issue here—"social and other benefits having a high priority for community services," D.C.Code § 5–1002(11)—are too imprecise to guide the Mayor's Agent in making a decision.

■ In a due process vagueness challenge, the inquiry is "whether the statute provides explicit standards so that the law gives 'the person of ordinary intelligence a reasonable opportunity to know what is prohibited,' and prevents 'arbitrary and discriminatory applications.'" *Nova Univ.*, 483 A.2d at 1188 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972)). Whether the statute is sufficiently precise will "depend[ ] in [large] part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Moreover, the constitutional sufficiency of seemingly ambiguous terms cannot be judged in a vacuum; the context in which they arise is crucial. *See Nova Univ.*, 483 A.2d at 1172. Finally, the meaning of a statute can be clarified by turning to "regulations [that] amplify[ ] the statutory standard" and to "judicial and administrative interpretations [that] have elaborated its text." *LCP, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 499 A.2d 897, 902 (D.C.1985).

■ The part of the "special merit" definition which KHLP challenges—namely, the alleged vagueness of the provision requiring "social or other benefits having a high priority for community services," D.C.Code § 5–1002(11)—must be viewed in the context of the Act's purposes. The Act aims at preserving historic landmarks and districts for "the health, prosperity and welfare of the people of the District of Columbia." *Id.* § 5–1001(a). Because the Act is intended to benefit the general population of the District, it follows that a project to replace an historic building must similarly offer community-wide benefits. Moreover, the phrase "high priority for community services," *id.* § 5–1002(11), makes clear that the offered benefits must be for the community at large, not primarily for a subset of privileged persons. Thus, according to reasonably clear inferences from the statutory language itself, projects such as office buildings or luxury condominiums, while generally beneficial to the community, more specifically benefit the occupants and cannot, as such, be viewed as adequate compensation for historic buildings taken away from the community as a whole; something more is required.

This court's interpretations of the "special merit" provision of the Act have enhanced understanding of the statute. These interpretations provide guidance to parties in applying for a demolition permit, and inform and assist the Mayor's Agent in deciding the case. More specifically, in *Committee of 100*, 571 A.2d at 200, we noted that, because the purpose of the statute as a whole is to preserve historic properties "as distinctive elements of the city's ... history" before "per-

---

11. The Association contends that, because KHLP failed to make this argument before the Mayor's Agent, KHLP should not be allowed to make it on appeal. *See Abolaji v. D.C. Taxicab Comm'n*, 609 A.2d 671, 672 (D.C.1992) (failure to raise procedural points below left appellate court an insufficient record with which to evaluate validity of petitioner's procedural arguments); *Hughes v. D.C. Dep't of Employment Servs.*, 498 A.2d 567 (D.C.1985) (failure to object to late issuance of an order during administrative proceeding meant court need not consider this objection on appeal); *see also Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 397–99, 110 S.Ct. 688, 699–701, 107 L.Ed.2d 796 (1990) (affirming California court's holding that taxpayer's failure to raise constitutional claims with agency, when California law allowed court review of only matters that had been brought up before the agency, left court without jurisdiction to consider

these claims on appeal). KHLP replies that it could not have been expected to raise a constitutional objection before the Mayor's Agent because it had no way of anticipating the need for such an argument until the Mayor's Agent issued his decision. We agree with the Association that KHLP, in recognizing the need to demonstrate it had a project of special merit, should have presented all available arguments, attacking the questionable "special merit" criterion itself in addition to attempting to demonstrate satisfaction of that criterion at the hearings or on motion for reconsideration. Thus, KHLP arguably has waived its vagueness claim. Nonetheless, we note that KHLP's challenge is not procedural, as in *Abolaji*, and is not barred by state law, as in *Jimmy Swaggart Ministries*. Accordingly, we are not precluded from considering it, and we choose to do so since the record is adequate and the parties have joined issue.

manent loss and demolition of such [ ] valuable structure[s], .... the Preservation Act demands [that they] be replaced with something sufficiently 'special' " and that "[f]actors which are common to all projects are not considered special merits." *See id.* at 200–201 (new office building that merely would provide more parking than building it would replace, and would increase rent and tax revenue, is not of "special merit"); *MB Assocs.*, 456 A.2d at 346, (proposed office building was not project of special merit because proposed contribution was common to all downtown development plans).[12]

■ We do not preclude the possibility that an office building or an apartment complex may have "special merit" if it provides particular "social or other benefits" that can be said to offer "community services" for persons other than those who primarily inhabit or work in the buildings. For example, in *Citizens Comm. to Save Historic Rhodes Tavern*, the Mayor's Agent found "special merit" in a proposed shopping complex on the basis of the "exemplary architecture," since the project would maintain facades of two historic buildings while demolishing a third historic building; but this court also noted that, because the project would provide jobs for over 2,000 persons, of whom 50 percent would be of low or moderate income, and also would provide $2 million in tax revenues, these benefits were additional factors militating in favor of the "special merit" finding. 432 A.2d at 717 n. 13. This possibility, however, does not diminish the central point applicable here: projects featuring benefits to the occupants of new buildings (such as the purchasers of KHLP's condominiums), coupled with general benefits to the District

(such as increased tax revenues or increased housing stock), are not "special" enough to come within the clause identifying "special merit" as "social or other benefits having a high priority for community services."

The challenged provision of the Act is not standardless given the purposes of the Act, the context in which the Act is applied here, and the judicial decisions clarifying its meaning. Our case law, in particular, has given substantial content to the meaning of the "social or other benefits" criterion defining "special merit" under the Act. We therefore must reject KHLP's contention that the "special merit" provision of the Landmark and Historic District Protection Act is unconstitutionally vague.

## VI.

*Conclusion*

KHLP failed to meet its burden of showing that the proposed luxury condominium project had special features that distinguished it from other luxury condominium projects and that it would benefit the community in general (not merely the residents of the condominiums). KHLP also failed to consider the feasibility of reasonable alternatives to complete demolition of Moses House. The Mayor's Agent, therefore, did not err in concluding that KHLP's proposed condominium project did not have "special merit." Furthermore, KHLP failed to meet its additional burden of showing that, without complete demolition, there could be no viable economic use for the property, or that the value of Moses House had decreased significantly

12. In fact, the record shows that KHLP was aware that its proposed "special merit" factors would probably not be accepted as such under the standards established by previous court decisions. At the conclusion of the November 1, 1991 hearing the following discussion took place between the Mayor's Agent and counsel for KHLP:

> MAYOR'S AGENT: ... But I'm just suggesting to you at this point that I haven't heard any evidence that would meet the burden of special merit.
> [KHLP'S COUNSEL]: You're rejecting the idea of additional tax revenue for the city?

> You're rejecting the idea of preserving the Comprehensive Plan of staying away from embassies and putting housing stock in the District of Columbia as no special merit?
> MAYOR'S AGENT: ... it's a very high burden to meet when we're talking about special merit. ... [y]ou would need to go back and refer me to some other cases to support your position because I'm not trying to create any new law. I'll let the courts do that. ...
> [KHLP'S COUNSEL]: *I think this is new law.*
> MAYOR'S AGENT: Well, the court will have to make new law.
> [Emphasis added.]

from the time it was designated a contributing structure in the Historic District. The Mayor's Agent, therefore, also did not err in concluding that KHLP would not suffer "unreasonable economic hardship" upon denial of the demolition permit. Finally, as we have elaborated, the third criterion under the "special merit" provision of the statute is not unconstitutionally vague.

*Affirmed.*