*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-AA-614

DC PRESERVATION LEAGUE, PETITIONER,

v.

MAYOR'S AGENT FOR HISTORIC PRESERVATION, RESPONDENT,

and

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, INTERVENOR.

Petition for Review of a Decision and Order of the
Mayor's Agent for Historic Preservation
(HPA-297-18)

(Argued March 17, 2022                    Decided September 15, 2022)

*Nicholas H. Jackson* for petitioner.

*Matthew E. Morris* for respondent. *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, *Caroline S. Van Zile*, Principal Deputy Solicitor General, *Ashwin P. Phatak*, Deputy Solicitor General, and *Samson J. Schatz*, Assistant Attorney General, were on the briefs for respondent.

*Katrina M. Krebs*, with whom *James Auslander* and *Gus Bauman* were on the brief, for intervenor.

Before EASTERLY and MCLEESE, *Associate Judges*, and CROWELL, *Superior Court Judge*.[*]

_____

[*] Sitting by designation pursuant to D.C. Code § 11-707(a).

McLEESE, *Associate Judge*: Intervenor Washington Metropolitan Area Transit Authority (WMATA) owns the Foundry Branch Trestle, which is a trolley bridge that is no longer in use, as well as two associated parcels of land. WMATA would like to demolish the Trestle, but it needs a permit to do so because the Trestle is protected under District of Columbia historic-preservation law. The Mayor's Agent for Historic Preservation granted a demolition permit over the opposition of petitioner DC Preservation League (DCPL). We vacate and remand.

## I. Legal Background

WMATA's request for a demolition permit rests on a claim "that failure to issue a permit [would] result in unreasonable economic hardship to the owner." D.C. Code § 6-1104(e). To show unreasonable economic hardship, WMATA must show that denying the permit request "would amount to a taking of the owner's property without just compensation" under the Takings Clause of the Fifth Amendment. D.C. Code § 6-1102(14); *Embassy Real Est. Holdings, LLC v. D.C. Mayor's Agent for Hist. Pres.*, 944 A.2d 1036, 1052 (D.C. 2008) (Section 6-1102(14) "incorporates the Fifth Amendment's protection against the taking of property without fair compensation."); U.S. Const. amend. V, cl. 5 ("[N]or shall private property be taken for public use, without just compensation.").

The Takings Clause applies not only to physical takings of property but also, in certain circumstances, to government regulations that unduly restrict a property owner's use of property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014-16 (1992). Regulatory takings can occur in two ways. *Id.* First, a per se regulatory taking can occur if a land-use regulation "denies all economically beneficial or productive use of land." *Id.* at 1015. Second, if "a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (internal quotation marks omitted) (factors include "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action").

The "test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property." *Murr*, 137 S. Ct. at 1943 (internal quotation marks omitted). It therefore can be critical to determine "how to define the unit of property whose value is to furnish the denominator of the fraction." *Id.* at 1944 (internal quotation marks omitted). The Supreme Court recently clarified that there is no "exclusive test for determining the denominator." *Id.* at 1945. Rather, the analysis depends on a set of factors that

"include the treatment of the land under state and local law; the physical characteristics of the land; and the prospective value of the regulated land." *Id*.

WMATA "is a government agency created . . . by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia with the consent of the United States Congress." *Washington Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925, 927 (1984). It is undisputed that the property at issue in this case can properly be viewed as "private property" for purposes of the Takings Clause and that the Takings Clause applies to the refusal of the Mayor's Agent to grant a demolition permit. *Cf. United States v. 50 Acres of Land*, 469 U.S. 24, 31 (1984) (Takings Clause applies to property of state and local governments allegedly taken by federal government).

## II. Factual and Procedural Background

The Mayor's Agent held an evidentiary hearing on WMATA's permit request. Except as indicated, the following facts appear to be undisputed. The Trestle was built in 1896 to provide trolley service from the Georgetown neighborhood in the District of Columbia to Cabin John, Maryland. The Trestle spans two lots. About sixty years after the Trestle was built, trolley service over the Trestle ended, and the

Trestle and lots became the property of a local bus operator, D.C. Transit. D.C. Transit apparently did not use the Trestle, which fell into disrepair.

After extensive litigation, assets of D.C. Transit, including the Trestle and the lots, were conveyed by court order to WMATA. *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 453-59 (D.C. Cir. 1996) (per curiam). The Trestle continued to go unused and deteriorated further, becoming a hazard to hikers passing through the area.

WMATA presented evidence that it would cost from $2 to $4 million to restore the Trestle and from $100,000 to $200,000 annually to maintain the Trestle. According to WMATA, demolition of the Trestle would cost approximately $800,000.

WMATA has unsuccessfully attempted to sell or donate the Trestle and lots to various third parties, including the National Park Service, Georgetown University, D.C. Water and Sewer Authority, D.C. Department of Parks and Recreation, and D.C. Department of Transportation (DDOT). One WMATA employee testified that, although discussions had not "gotten that far," she believed that the National Park

Service would accept the lots if the Trestle could be removed. Another WMATA employee testified that demolition of the Trestle would "allow" such a transfer.

The 2019 assessed value for the two lots at issue added to more than $500,000. Appraisals of one of the lots, performed in 2009, ranged from $84,000 to $730,000.

The Mayor's Agent granted the requested permit, concluding that denial of the permit would cause unreasonable economic hardship to WMATA. The Mayor's Agent's decision was not clear about the definition of the property at issue, at times referring solely to the Trestle, at other times referring to both the Trestle and the lots, and at other times referring to the property or properties. In determining that denial of the permit would cause undue economic hardship, the Mayor's Agent focused on the test applicable to per se regulatory takings. *See Lucas*, 505 U.S. at 1015 (per se regulatory taking can occur if a land-use regulation "denies all economically beneficial or productive use of land"). The Mayor's Agent formulated that test in a variety of ways, including whether there was "any other reasonable economic use for the" Trestle and whether there was "any viable economic use for the property." *See, e.g.*, *900 G St. Assocs. v. Dep't of Hous. & Cmty. Dev.*, 430 A.2d 1387, 1391 (D.C. 1981) (in determining whether denial of permit to demolish historic building was unconstitutional taking, court describes test as whether "there is any other

reasonable economic use for the Building"); *id.* at 1392 (discussing whether there "was an alternative economic use of the property"). Without making findings as to a number of the issues contested by the parties, the Mayor's Agent concluded that the Trestle had "no feasible use."

### III. Analysis

DCPL argues that the Mayor's Agent erred in granting the demolition permit. We agree.

This court's review of the Mayor's Agent's decision is "limited and narrow." *Embassy Real Est. Holdings*, 944 A.2d at 1050 (internal quotation marks omitted). We will uphold the Mayor's Agent's decision if the "findings of fact are supported by substantial evidence" and the conclusions of law "flow rationally from these findings." *Id.* (internal quotation marks omitted). We will sustain the Mayor's Agent's reasonable interpretation of statutes that the Mayor's Agent administers. *Id.*

We perceive two flaws in the decision of the Mayor's Agent. First, as previously noted, the decision is not consistent or clear as to the unit of analysis for purposes of the Takings Clause: i.e., whether the inquiry is into the effect of a permit

denial on the use of the Trestle or on the use of lots and the Trestle considered as a whole. That lack of clarity is understandable, because our decisions have not been clear on the point. *E.g.*, *900 G St. Assocs.*, 430 A.2d at 1391, 1392 (sometimes referring to whether there was alternative economic use of building and sometimes referring to whether there was alternative economic use of property). On remand, the Mayor's Agent may need to explicitly address this issue, in light of the Supreme Court's recent decision in *Murr*, 137 S. Ct. at 1945.

More fundamentally, the Mayor's Agent in our view erred on an issue of law by focusing in the abstract on the Trestle's usefulness or lack thereof. An owner does not establish a per se regulatory taking simply by showing that the owner's property has no "economically viable use." *Lucas*, 505 U.S. at 1015 (emphasis and internal quotation marks omitted). Rather, the Takings Clause inquiry is into whether government regulation *caused* the property to have no economically viable use. *See id.* (per se regulatory taking can occur where "regulation denies all economically beneficial or productive use of land"); *Neifert v. Dep't of Env't*, 910 A.2d 1100, 1119 (Md. 2006) ("Causation is a necessary element to establishing a valid takings claim."); *Ventures Nw. Ltd. P'ship v. State*, 914 P.2d 1180, 1187 (Wash. Ct. App. 1996) ("An owner claiming loss of the economically viable use of property must show that the challenged government regulation proximately caused

the loss of all such use."); *see generally Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (explaining that there is no "set formula for determining when justice and fairness require that economic injuries *caused* by public action be compensated by the government") (emphasis added and internal quotation marks omitted).

The Mayor's Agent made no finding as to whether the denial of a demolition permit would cause the Trestle to have no economically viable use. Apparently undisputed evidence indicates the absence of such causation. The Trestle has no current use, is in a dangerous condition, and would cost substantial sums to repair. That is why WMATA seeks permission to demolish the Trestle, at significant expense. In other words, the denial of a demolition permit would not cause the Trestle to lack an economically viable use; rather, WMATA seeks a demolition permit precisely because the Trestle already has no economically viable use. We see no basis for a conclusion that the denial of a demolition permit would be a per se regulatory taking of the Trestle. *See, e.g.*, *Neifert*, 910 A.2d at 1119 (holding that property owner failed to establish that denial of permit at issue constituted per se regulatory taking, because property was undevelopable before denial of permits and therefore denial of permits was not "proximate cause" of property being undevelopable).

The Mayor's Agent did not explicitly address whether denial of a demolition permit would be a per se regulatory taking of the property as a whole (i.e., the lots and the Trestle taken together). The Mayor's Agent thus did not resolve questions that would be necessary to reach such a conclusion, including: (1) whether the Takings Clause analysis should properly focus on the property as a whole rather than simply the Trestle, *see generally Murr*, 137 S. Ct. at 1945; (2) whether the property as a whole lacks any economically viable use in its current condition; and (3) whether, if so, the denial of a demolition permit would be the cause of the lack of any economically viable use. We leave those issues for possible consideration on remand. Similarly, the Mayor's Agent did not address whether the denial of the demolition permit—even if not a per se regulatory taking—might amount to a regulatory taking under the multi-factor test described in *Murr*, 137 S. Ct. at 1943. We also leave that issue for possible consideration on remand.

We are not persuaded by the arguments in support of affirmance advanced by WMATA and the Mayor's Agent. First, WMATA and the Mayor's Agent argue that WMATA should not be "saddled" with the Trestle, because WMATA is a public agency with a limited budget and should not have to divert funds to the Trestle, given that the Trestle was in poor condition when WMATA became its "involuntary" owner. Although the Mayor's Agent did refer to WMATA as an involuntary owner

of the Trestle, the basis for that reference in the record is not clear. Instead, the record appears to indicate only that the Trestle and the lots were conveyed to WMATA by court order. *Democratic Cent. Comm.*, 84 F.3d at 453-59. In any event, WMATA's contentions do not seem relevant to whether denial of a demolition permit would amount to a per se regulatory taking. Rather, they seem at most potentially relevant to whether denial of a demolition permit would constitute a regulatory taking under the multi-factor test described in *Murr*, 137 S. Ct. at 1943.

Second, WMATA argues that issuance of a demolition permit would make it possible for WMATA to transfer the lots to the National Park Service, which would, in the Mayor's Agent's words, "serve to protect [the] area's historic character." The Mayor's Agent made no finding, however, that issuance of a demolition permit would make it likely that the lots would be transferred to the National Park Service. Moreover, the evidence on that issue was quite scant, consisting of the beliefs of two WMATA employees, one of whom acknowledged that discussions with the National Park Service had not gotten that far. Finally, this consideration as well would not establish the existence of a per se regulatory taking, although it might well be potentially relevant to whether a regulatory taking could be established under the general multi-factor approach to regulatory takings.

Third, we are not persuaded by the arguments of WMATA and the Mayor's Agent that affirmance is warranted based on our decision in *900 G St.*, 430 A.2d at 1387-92.  As we have already noted, our decision in that case was not clear as to whether the proper unit of analysis was the building alone or the building and the property on which the building sat.  430 A.2d at 1391-92.  The Supreme Court's recent decision in *Murr* has emphasized the importance of that issue.  137 S. Ct. at 1943-45.  In any event, we held in *900 G St.* that there was no regulatory taking, because there was evidence that the building at issue could be rented and that there were possible purchasers for the property.  430 A.2d at 1392.  *900 G St.* does not support the conclusion that denial of a demolition permit is a per se regulatory taking where the structure and/or property at issue would have no economically viable use whether or not the permit were granted.

For the foregoing reasons, we vacate the decision of the Mayor's Agent and remand the case for further proceedings.

*So ordered*.